And we'll hear first from Mr. Richards. Good morning. May it please the court, Ira Richards for the appellants. Just a few weeks ago, this court in ET versus Paxton reminded us that Article III jurisdiction is first and it's last. Arguments against jurisdiction aren't waivable. All arguments for jurisdiction are waivable. The problem that the parties have here, the settling parties have, is regardless of the impact or not of filing a proof of claim in bankruptcy, the class definitions in these two settlements are overbroad and include uninjured parties. And on that basis alone, the lower court's orders approving settlements need to be vacated. It takes a little bit of hunting to find the class definitions and the impact of the class definitions on standing. Although Rule 23c requires a court certifying a class to define the class and the order, that didn't happen here, either in the bankruptcy court or in the district court. Are you contending that the order of settlement should be vacated as to everybody or just as to 161 plaintiffs? As to everybody. As to everybody because the court lacked Article III jurisdiction to even consider the settlements, let alone enter the orders approving the settlements. So if you look at the record, and it's unfortunately not in the record excerpts, but it's page 1336 of the record. And it's a very long record, Your Honor. And it's an attachment to the motion that Chesapeake, as the defendant, filed in the bankruptcy to seek application of Rule 9023 of the bankruptcy rules to these settlements. And attached to that motion were the two settlement agreements at issue here, the MEC settlement and the non-MEC settlement. And at page 1336, in the MEC settlement agreement, the class is defined as all individuals and entities, including their predecessors and successors in interest, who according to the business records maintained by Chesapeake, and here's the critical language, are or have been lesser parties to one or more Pennsylvania leases to the extent of their interest in such Pennsylvania leases. Now that's not cabined at all by receipt of royalties, and that becomes significant when you then look at the class notice that the bankruptcy court and the district court put in this case. And you can see that that was also an attachment to the Chesapeake motion for the bankruptcy court, and that's at page 1434 of the record. And the first question in that notice said, why did I receive this notice? And the answer is, records show that you or someone from your family have received or currently receive royalty payments from Chesapeake, that's easy, from a natural gas well in Pennsylvania. But here's the important part. Or that you have an unexpired lease with Chesapeake that is not currently producing hydrocarbons. That means the class includes people who don't have producing wells. If you don't have a producing well, you can't possibly have been injured by overcharges for post-production costs, the cost of moving gas from the wellhead downstream to a point of production. So on that basis alone, the district court and the bankruptcy court affirmed certified overbroad classes. Did you erase that in your brief? We did it. We did not. And the significance of EP versus Paxson is that even though we didn't raise it in the brief, we didn't raise it because it's a jurisdictional issue. So we did raise the issue of the overbreath of the class definition. And from there, that issue, that class definition, including uninjured class members, gets worse as you draw down. So the class includes thousands of class members who had their claims discharged in bankruptcy, and they have no injury because the bankruptcy discharged it on the effective date, which occurred before these settlements were presented to the bankruptcy court and approved by the district court. The district court, in fact, made the mistake of concluding that Article III jurisdiction and standing is only an issue to be assessed at the time of filing the complaint. We know from Justice Kavanaugh's decision in TransUnion that that's not correct. Let me ask you, did the bankruptcy court say he had authority apparently under Rule 9019? He also, I don't recall whether he said anything about arising in, arising under, or related to jurisdiction. I don't recall whether he said that, but Judge Rosenthal characterized it as related to jurisdiction post-confirmation under Craigstors. And on appeal, Kirkland has a third argument, which is arising in jurisdiction. So that's all bound up in your Article III argument. Why are all three of those wrong? Let me go in reverse then. On the arising under jurisdiction, recall that the class representatives here, the named plaintiffs, didn't file proofs of claim. And as Judge Rosenthal confirmed as a result, they and the vast majority of class members had no claims before the bankruptcy court, and those claims were discharged. The only potential arising under jurisdiction relates to the 161 people who filed proofs of claim, none of whom were named plaintiffs in this case. And TransUnion, I think, becomes important in that respect, because one of the lessons from TransUnion is the class representatives themselves have to have their own jurisdictional basis to serve as class representatives. There's no standing by osmosis. So if the purpose of this settlement, and I question whether it is, was to resolve the proofs of claim of 161 people who filed it, it's certainly an odd thing, both from inadequacy of representation and typicality, but also jurisdictional issue, of having that discussion with, and a settlement led by people then filed proofs of claim. So that late argument that wasn't raised before either the bankruptcy court or the district court about arising under jurisdiction fails anyway because of the failure of the named plaintiffs to file proofs of claim. As to related to jurisdiction, I think this case is Craig's source. So you don't have to look any further than paragraph 37 of the same motion that Chesapeake filed before the bankruptcy court. And it's at page 1303 to 1304 of the record. And in that paragraph, Chesapeake says some really interesting things. The first thing it says is that the claims in the two class actions, the pre-existing class actions that are purported to be settled here, the now called the MEC and the non-MEC class actions, those claims have been discharged. They're gone. The end of paragraph 37 says the reason we're settling these cases is because we're concerned about post-effective date, future potential class litigation. The settlement funds used to settle these claims are being used to pay post-effective date potential claims, not on account of pre-effective date claims. Now you're taking, is that their motion for approval of settlement? Is that what you're talking about? It is. I'm actually referring, Judge, to the motion that they filed before the bankruptcy court. And that in the record starts at page 1288 and it goes to page 1404. And it's paragraph 37 of that motion. And then again in paragraph 44. That's the motion to approve the class settlements. That, correct. That was the motion asking the bankruptcy court to apply rule 9019 and 9023. Okay. And that again was a motion filed by Chesapeake not as the debtor and the defendant, not by class counsel. So basically what you're saying there is that they're talking about settling these class actions for which no proofs of claim were ever filed and which were supposedly discharged solely in terms of the future impact on the debtor. Of the reorganized debtor after the effective date. And that's the principal concern. And in fact, the record shows that the funding for this is coming from the operations of the reorganized debtor. It's not being paid pursuant to the plan. Where is that? That's in the, I can give you the citation to it. It's in the transcript of the final approval hearing before Judge Rosenthal. Okay. It was a question that was raised before the bankruptcy court. And I think it was addressed at the hearing before Judge Rosenthal. The other significant part is if you look at the actual terms of the plan. And that's at tab 18 of the record excerpts. And this is how royalty and working owner interests are supposed to be treated under the plan. And it says, and this is paragraph T, page 36 of the plan. And it's page 648 of the record. Preservation of royalty and working interests. Notwithstanding any other provision in the plan on or after the effective date, all royalty and working interests shall remain in full force in effect in accordance with the terms of the granting instruments or other governing documents applicable to such royalty and working interests. Then it goes on to say that royalty and working interests shall not be modified, affected, or impaired in any manner by any provision of the plan or the confirmation order. And any interest should, obviously, if you filed a proof of claim, your interests are paid according to the terms of the plan. Let me ask you a question, since time is running sort of. There were tentative settlements for the, what you call the MEC and the non-MEC class actions before bankruptcy was even filed. Of course, they hadn't been consummated. As I understand it, those tentative settlements were also gonna make changes in the royalty structure going forward. Is that not correct? Yes and no. So the MEC settlement at the time, the Demcheck settlement that was pending before Judge Mannion in the Middle District of Pennsylvania had a different structure. There was a cash fund based on a certain percentage of the post-production charges during the calculation period. And I wanna say it was 55%, but I could be getting that wrong. After the effective date of the settlement had it been approved, there would have been a reduction in the post-production charges. So it would have been, post-production charges would have been maintained, but there would have been a slight reduction in it. And procedurally, although Judge Mannion had preliminarily approved those settlements, they never got to final approval, the MEC settlement in particular. There were objections, including from one of the objectors here, Ms. Sarnosky, who questioned the going forward relief. But even as to the going forward relief, the parties argue that there's some Article III jurisdiction by virtue of a continuing business relationship and the potential for future royalties. The problem, of course, with that is the class definition, that you have people who don't have producing wells and people who have leases but may not have them anymore. And there's no information in the record about the class representatives. We don't know if they still have their leases, if they still have their, if they have producing royalties. But Justice Kavanaugh's opinion in TransUnion becomes really important, because what Justice Kavanaugh wrote in that opinion was that a plaintiff must demonstrate standing separately for each form of relief. So standing to seek injunctive relief or future relief doesn't necessarily mean that you have standing to seek damages in the past. And then he goes on to say, and this is really important for the parties' arguments here as to this continuing injury theory, the mere risk of future harm standing alone cannot qualify as a concrete harm, at least until the exposure to the risk of future harm itself raises a separate concrete injury. So just the threat that someday I may get a royalty and someday that royalty may be miscalculated in some way is not a sufficient basis for Article III jurisdiction. I have another question about the underlying facts here, and that is did the, what is the difference between the Pennsylvania Attorney General's settlement and the MEC and non-MEC ones? I think they're significant. I mean, the Pennsylvania Attorney General covers all the same landowners, right? It does, yes, and that's important.  the Pennsylvania Attorney General's settlement and the MEC and non-MEC settlement are tabs 19, 22, and 23 of the record excerpts. And the key difference is the language is slightly different, but in both the MEC and non-MEC settlement, under the Attorney General's settlement, Chesapeake has to offer a choice to landowners, depending on whether they have a MEC or non-MEC lease, to choose to accept a new method of having their royalties calculated. A month later, after the effective date, after the settlement agreement with the AG has already been entered into, and after their claims have already been discharged, the private plaintiffs and their lawyers enter into these settlements that remove that freedom of choice. So although it starts by saying, and each of the provisions start by saying, you can elect among these different methods of calculating royalties. If you don't return your election, we're gonna treat you as if you've made an election. So it becomes, and this is another significant difference, there's no language in the Attorney General's settlement about this, and that default election, if you don't send in your form, is gonna run with your land, we're gonna file the settlement agreements with your lease, and we're gonna modify it and amend your lease forever. I saw the leases and the Attorney General didn't do that, right? Right, and so in looking at the value of the settlement, the courts below asked the wrong question. There's still nothing in the record that values the going forward relief or the claims that the class is giving up, but in looking backward at the potential cash value relative to the discharge claims, they didn't ask the question of what value, if any, is there from having this freedom of choice? But didn't a representative of the Pennsylvania Attorney General show up at the settlement hearing? A representative of the Pennsylvania Attorney General showed up at the hearing before the bankruptcy court where Chesapeake sought approval under Rule 9019 of that agreement. The Pennsylvania Attorney General wasn't at the final approval hearing, and the language is important because the notice that went out to the class said the settlements are independent. The Attorney General's settlement stands separate from the private settlements. The only connection, if there is one, and that may be too strong of a word, is that the Pennsylvania Attorney General's in tab 19 permits Chesapeake to implement that choice, that offer process through the private settlements, but it doesn't then authorize the private plaintiffs to take away that choice and assume that the failure to return an election is an election. Yeah, but my point is that I thought the representative from the Pennsylvania AG said that he, I thought he was giving his blessing to the class settlements at that time. He was silent on that. He was? As I remember the transcript that I put in his statement. I thought this is all, you know, we've been foes before, but we're all friends now. I think that was mostly coming from Chesapeake's counsel, Judge. The Pennsylvania Attorney General was silent as to the two class settlements. Did you ever ask the Pennsylvania Attorney General to step in and say this was stomping all over the deal he reached? The two private settlements? Yeah. We did not because they're separate in another sense. So the Pennsylvania Attorney General has his own accountability and check on whether that was a good deal for Pennsylvanians. Class counsel and the named plaintiffs have a different sort of accountability. And in my home circuit, the third circuit, the task force on selection of class counsel talks about how the relationship between class lawyers and class members is an agency relationship. It's a principal and agent. And then in the settlement context, a lot of times that that relationship can get distorted by the incentives. So the accountability in this instance is through the court acting as a fiduciary to absent class members, making sure that those distorted incentives don't go awry as they did here, where the class action settlement procedure via bankruptcy can be weaponized in a way that actually takes something away from class members without a showing that there's significant value for what they're releasing, as opposed to actually creating a benefit, especially given that it was already there and already available as a choice for class members through the AG settlement. Okay, well, you're over 20 minutes, but this is just a totally side question. Does anyone at Schneider Harrison remember a lawyer named Stanley Zimmerman? I do not, but I'm gonna have to ask. That's too bad. He passed away a while ago, but he was a real estate lawyer. Anyway, okay, the next we'll hear from Mr. Hicks. Thank you, Your Honor, and may it please the court, George Hicks for Apelli Chesapeake Energy Corporation. I'm going to address the Article III and subject matter jurisdiction issues, and my colleagues who are counsel for the classes will address the Rule 23 issues. The settlements at issue here resolve allegations that Chesapeake has underpaid royalties to Pennsylvania leaseholders, starting over a decade ago and continuing through the present day. So why didn't you settle these during the course of the bankruptcy? Your Honor, I don't know the exact answers to why it was not settled during the course of the bankruptcy. Bankruptcy lawyer, you weren't involved, I mean, please. Well, Your Honor, I think that it was, honestly, it may have been the result of, number one, lots of other things going on during the bankruptcy. Number two, the fact that the bankruptcy did require the parties to come back to the table and- Well, actually, well, I mean, as I read, I read the plan and the disclosure statement very carefully, and it appears that the debtor was obviously crucially aware of these lawsuits because it had a whole bunch of royalty lawsuits going on all over the country. It did purport to settle some of those lawsuits before the six-month Chapter 11 wound up, or else it said, here's what we're going to do, if I'm not mistaken. As to these lawsuits, it said, we expect that these lawsuits, which were stayed pending bankruptcy, only give rise to, what do you call it? They only give rise to dollar claims, monetary claims, which we expect will be treated along with the plan and resolved as general unsecured claims. When you look at the schedule, they are listed as disputed. When you look at the plan, general unsecured claims are to get something like 0.07%. And then you consider, the plan says many, many times over that if no proof of claim was filed, you are not entitled to take anything under the plan. When the plan is finalized, the debtor is discharged and released from all liability for these settlements, period. Now you say, or you've said in your case, well, we could treat these as late filed claims because we have that. There's never been any claims. So explain to me, explain to me how you reconcile the plan and the disclosure statement, which is supposed to go out to all the creditors with this deal that you're making post-bankruptcy. Your Honor, there's a lot packed into that. So I do want to- Well, I just want you to know that I have done an awful lot of work trying to run down how you're doing this post-plan, extra-plan settlement that mainly has a forward-looking value to the detriment or arguably to the detriment of people whose leases were supposed to ride through. Well, Your Honor, first of all, I think that one point that you mentioned in there was the fact that this had all been litigation, adversity, and antagonism that well-predated the bankruptcy and involves leases that well-predated the bankruptcy. So I think- Settlement that well-predated the bankruptcy. It just hadn't been carried through. You could have lifted the stay and perfected that settlement in the Western District of Pennsylvania, couldn't you? But I think that that doesn't remove the option and the ability of the parties to continue negotiating within the bankruptcy context. There's nothing in the disclosure statement that says you continue negotiating. The disclosure statement says, and I could go somewhere around here, it says we expect these to be resolved as monetary claims on the basis that they will participate with general unsecured creditors. And that's what you were telling all the creditors. Your Honor, I still don't think that that precludes the ability to enter into these settlements. And I actually, and I don't understand the objectors to be arguing otherwise. I mean, I think their only arguments are that there was no Article III injury at the time of the settlement. No, their briefing goes way beyond that. They're saying that there was no related to jurisdiction, which is what Judge Rosenthal predicated her order on. Well, Your Honor. You raise a rising in only in your briefing to this court, as far as I'm aware. Well, Your Honor, we think there is both a rising in and related to jurisdiction. And I think that the arising- Did you argue that to Judge Rosenthal? I believe we did, because I think we mentioned that there were claims that were extinguished. I legitimately did not say that. Well, because she found related to. And if you find related to, you don't have to find a rising in. But we think that a rising in, and I think the best example, the best demonstration that there is a rising in jurisdiction here is that when we pointed this out in our response brief, and pointed out the filing resolution of a claim is a rising in, and the approval agreement is, the only response by the objectors is not to take issue with that point. It's to sort of shift the conversation to, well, there couldn't have been typicality and adequacy. How can it arise in the bankruptcy when the whole context of the bankruptcy is the creditors are supposed to file timely proofs of claim in order to share in the distribution of the debtor's assets. No proofs of claim were filed on behalf of these class members as a class or individually except for his 161 clients. So they weren't entitled to share. The whole point of bankruptcy is number one, you marshal the assets according to the rules. And number two, you pay them out according to the distribution entitlement. And what you're doing is a post-confirmation special deal that where you. Yeah, I wouldn't say it's a special deal at all. And I would push back on the idea that because there weren't proofs of claim filed for the name plaintiffs or the other plaintiffs, many of the other plaintiffs in the class, that actually matters here because the whole point of a proof of claim is to put the debtor on notice of potential liabilities against it in the proceeding. And here, the debtor, Chesapeake, was well aware of this. It had been argued for 10 years. And these name plaintiffs are on the claims register. So you wrote this letter. I think you wrote this letter to some landowners and said, don't bother us with your claim. You're too late. Your Honor, I believe that was in the context of those landowners trying to start another lawsuit and start another settlement. They stood in the same position as these class members, didn't they? And you chose to exercise the bar date on them, but you don't choose to exercise the bar date on the classes here. Well, Chesapeake has the ability and the option under the plan to exercise the bar date late. But it doesn't, I mean, the plan specifies how you're supposed to do that. I mean, it's very annoying to me that Chesapeake seems to think that it can do things in addition to the plan and get the bankruptcy. It would have been one thing, it seems to me. If outside the plan, you had lifted, once the plan is over, you could have gone back to the court in the Western District of Pennsylvania and said, you know, these monetary claims are discharged and we want to renew the settlement negotiations. You could have done that, could you not? Your Honor, I don't know if that's an option to be able to go back when we already had the settlement in place. And if you're saying at the end of the post, well, the settlement only occurred literally one month after confirmation and effective date. So, you know, I don't think this is a situation, you know, I heard my colleague refer to the Craig Storrs situation. I don't think this is anything like that. I mean, where you had a dispute that arose two years after confirmation involving only post-confirmation conduct. This is all about primary conduct that occurred previously. I am very dubious about that because what you have are monetary, what did you do with their, you have three kinds of claims. You have pre-bankruptcy claims, you have administrative status claims, which your plan says were being paid. So I assume you must have been paying something to the royalty owners during the administrative period. Is that correct or not correct? I'll defer to my colleagues on that, but I believe there were... And then you come up with one month later, the only consequent, you're paying a token amount of money. And I understand these were, you know, general unsecured claims, had they been treated as general unsecured claims for the monetary amount, each landowner might've gotten $10. Well, they're getting $150 when you, I forget, I think that's net of the several million that you're paying plaintiff's lawyers, but then you're suddenly modifying thousands of leases going forward. Well, Your Honor, I... And you specifically told everybody during the bankruptcy that they were riding through. But Your Honor... And I don't see the backward looking connection to the plan at this point. That's my whole point about Craig's... Sure, and the last thing I'll say before I yield my time to my colleagues... Well, I'll give you a little more. Well, I think that it does pertain to the implementation and execution of the plan because the way to determine whether the settlement satisfy, for example, Rule 23's requirements and fairness is to look at what was done in the plan to the claims that might have been there. And you have to compare that to what they would be getting under the settlement as also compared to the pre-bankruptcy situation because the bankruptcy obviously is an intervening factor that's going to affect the, you know, what the class members are going to get, what the leaseholders are going to get. In the bill of claims litigation, it may be the debtor, the reorganized debtor's desire to work something out with these people going forward because otherwise, if their lease, because their lease is rode through, you've got exactly the same problem going forward, which is that they're going to say that where they have producing properties, they're going to say that you're not calculating the post-production costs accurately or whatever. So you've got that problem, which you told the bankruptcy court and all the creditors in the disclosure statement was monetary, we deal with that as general, but otherwise, it rides through. So I don't understand how this post-bankruptcy settlement jobs would plan. Well, Your Honor, and I think you're only referring to the concept of whether there's related to jurisdiction. I think that's separate from, number one, the fact that there is Article III injury, and number two, that we think that there is a rising in jurisdiction, which I still haven't heard from the objectors why there wouldn't be a rising in jurisdiction. Because there's no claim. A rising in means it's part of the bankruptcy and the fact that they might have been a claimant during the bankruptcy does not mean that after the bankruptcy, my view is once a non-claimant, always a non-claimant. And if the debtor chooses to pay off, bankruptcy eliminates the remedy, but not the obligation. So yeah, if the debtor chose to pay off, it could do that, but that's post-bankruptcy. It has nothing to do with the scope of the Chapter 11 as a matter of law, in my view. Tell me a case otherwise. Well, Your Honor, I haven't heard a case that supports that from the objectors, and I don't see why there still wouldn't be a rising in jurisdiction. If it's undisputed that a filing and resolution of a proof of claim is an arising and proceeding, and the approval of an agreement to settle filed claims is an arising and proceeding, why there wouldn't be here? They're not allowed. Not within the bankruptcy. Well, there had been 161 proofs of plain file, so the- Not for the class settlement. I mean, I can't say it nearly as well as my learned colleague, Judge Jones, but the same basic problem obtains to me too, and that is this is an outside the bankruptcy court proceeding is what it looks like, but the bankruptcy court is blessing it. How is my very elementary conceptualization of this case wrong? Well, the bankruptcy case is still ongoing, and the question is whether the bankruptcy court has jurisdiction to do what it is doing. Well, actually, it's not. I mean, the whole point of confirmation, you may not have consummated, but that's not the point. You've confirmed, and the effective date is passed. Well, I think that this court's cases have said that the fact that a plan is not fully consummated is an indicator- What's cited to me? I'm sorry? Cited to me. I believe that the Inouye-Brass decision, I'm quite confident, says that the fact that a plan was not fully consummated is a factor in finding related to jurisdiction post-confirmation. Well, it may be a factor, but that still doesn't mean that it's the determinant. I'm not saying it's the dispositive determinant, but other factors that this court has frequently looked at is whether the antagonism predates the bankruptcy or the confirmation, and whether primary conduct predates the bankruptcy and the confirmation. I think we have all of that here, particularly when you look at this court's cases, whether it's Enron, whether it's the Genma decision that came out just a few weeks ago. I mean, that was considered to be, I think, the courts at the cusp of related to jurisdiction. That was seen two non-debtors in a suit that had nothing to do with any pre-bankruptcy conducts. And I think we have exactly the opposite here. This has been antagonism litigation that has been going on since 2012, carried all the way through, and has been, tried to be negotiated and resolved at every point through, I mean, this is not a rogue settlement. This has been the product of. Where did you ever show up in the bankruptcy court with class counsel before you confirmed the plan? Your Honor, that is a question where I do want to defer to class counsel who will have that answer for you more definitively. But I think that just simply in terms of the Article III injury and subject matter jurisdiction questions, I think that this court's cases certainly make it a very strong case for having both the injury not withstanding the proofs of claim. Let me explain a little more where I think the broader picture is, because as I said, the whole purpose of bankruptcy is to marshal the assets and distribute them in an equitable way according to all the creditors. Chesapeake got rid of $6 billion of debt in its filing and confirmation of its plan, if I'm not mistaken. I don't know how much money it had going forward. Mr. Richards says that you were paying off these classes with money that wasn't in the plan. It was post-confirmation. Um, suppose in settlement of these classes because Chesapeake needed certainty going forward in the status of the leases, Chesapeake had said, we're gonna give you a formula that pays the royalty owners twice as much as we've ever paid them for. And that's what the formula will be going forward with settling the class. That would have been a great deal for the class, but what about the lenders who were supporting Chesapeake going forward who would have had secured interests in those oil and gas interests? That was supposed to be handled during the bankruptcy, right? Otherwise, those lenders are not getting there an accurate picture of the debtor going forward. Your Honor, I don't think it was any secret that these negotiations and discussions were going on about the class. The whole point of a 9,019 settlement is that you are noticing a hearing. So you didn't send out notice to all the Chapter 11 creditors about the settlement, right? I don't know, standing here today, whether that's the case or not. I strongly doubt it. Because it's notice and a hearing, right? But again, I don't, again, it... Wasn't necessary? I don't think it was necessary. I mean, in the same way that proofs of claim weren't necessary here. Everyone was on notice and everyone knew that this was... And the debtor, everyone knew what the debtor said, which was, well, we expect monetary obligations and all they'll be is in a general unsecured claim and those people are getting 0.07%. And then, but their leases are totally riding through unimpaired, unaffected, and so on. So all the creditors don't know what you're doing. It's one thing to represent that we're gonna settle general unsecured claims and here's the pot for the general unsecured claims. But it's another thing to be saying, post-bankruptcy, we're gonna treat it as if we settled a major, two major pieces of litigation, which these are, but in a way that could have affected the pre-bankruptcy situation. Maybe it didn't here, but if you could do it here, you could do it anytime and that's my problem. Well, Your Honor, the only thing I could say to that is that I think that to find that that, or the circumstances here would not constitute bankruptcy jurisdiction, I think would be, would require certainly an extension of this court's decisions, because I think that under this court's decisions, there is both a rising in and post-confrontation related to jurisdiction. That's it. Okay, well, if you have more to say on rebuttal, I'll certainly give you time and I'm sorry to belabor all this. Well, I do wanna make sure that my colleagues. Well, of course, they have a chance. Mr. Seitz. Good morning. Daniel Seitz for Appellee's MEC Class Plaintiffs. May it please the court. Time permitting, I'd like to address the, first, the issue of the proof of claim and the argument that the named plaintiffs essentially had no claims before the bankruptcy court at the time of the settlement. As Your Honor knows from the record, we didn't file a proof of claim during the bankruptcy proceedings because we had been in active settlement negotiations prior to the bankruptcy and throughout the bankruptcy in an effort along with the Pennsylvania Attorney General and the other private plaintiffs to reach a global resolution of these claims. I don't know where, but filing a proof of claim is something, any person can object to a proof of claim, which is why they're here. So a bank could have objected. You know, you could file your claim and then they could say, oh, well, they're working hard to negotiate something and then the plan just says they're gonna collect with these people. The plan says, as to your claimants, you're gonna take part in the monetary damage with general unsecured creditors to the extent that there's a proof of claim. And then it says their lease is right through going forward. So the other creditors have no idea that you're really not gonna do that. Well, certainly Chesapeake was keeping the bankruptcy court apprised of these claims and the efforts to settle them throughout the bankruptcy proceedings. We certainly weren't strangers to the proceedings. I mean, we had, at some point we had hired counsel who appeared on behalf of the MEC class during the bankruptcy proceedings. And certainly these claims were known to the court and. I couldn't, well, I read the transcript of the 9,019 hearing and I didn't detect that. I'll take your word for it. Well, I mean, essentially our view is that the proof of claim procedure has been treated with some flexibility and approached in a pragmatic way to, because it is designed to protect the debtor from unknown claims, claims that seemingly come out of nowhere. And essentially our ongoing negotiations and this previously pending settlement functioned as a proof of claim so that everyone was aware of what was happening. So that there seems to be, I think, an incongruity in allowing an objector to take this procedure that's designed to protect the debtor as a tool. Well, I'm sorry, but the law explicitly allows any party in interest to object to any claim. And it is a fact, I believe, that the unsecured creditors committee objected to the confirmation hearing, although that's not technically material. But the point of filing a claim is for the benefit of everybody participating in the proceeding because when the unsecured creditors, they have a right to know how many people and what is the general scope of obligation within the unsecured creditor class, which this is. And if you don't file a proof of claim, then they know going into confirmation that the bar date is passed, that there's been no claim filed. And the only representations in the plan and the disclosure statement are late filed claims are out of luck. And since these were a billion, you filed two for a billion dollars, didn't you, before the bankruptcy had occurred? No, Your Honor, we had the original case was filed on behalf of this class in Pennsylvania in 2013. Well, I understand that, but the claims were millions and millions of dollars, were they not? The claims were substantial because the allegation had been underpayment of these leases that had been going on for some time. And I did want to address this question about the difference in the settlements between the Pennsylvania AG settlement and the MAC settlement, and also this, and the relationship between the two. First is that the Pennsylvania AG, their office did object to the previously pending settlement in Pennsylvania. They were keenly aware of these claims and what had been happening. In these proceedings, not only did the Attorney General's office not object, but we were essentially working together at the time that these were proposed for approval. And the offices at that hearing, they certainly had the capacity to object, and as they had done before, and didn't this time. You said they had objected before, but they obviously didn't do it at the 9,019. Correct, they submitted an objection in, I believe it was late, it was at the end of the objection and opt-out period from the previously pending settlement in the Middle District of Pennsylvania. So they certainly understood that they, if they wanted to lay in, they could have. And here, their settlement actually was interrelated with ours in terms of its implementation. But at the same time, the benefits in our settlement, the MAC settlement, did go beyond what was in the Attorney General's settlement in terms of additional improvements to the royalty payment methodology. And the default for, to the higher of the two options is found in our settlement. It's, the language is clear in ours that those who didn't make an affirmative election between the two payment options are going to receive the higher of the two options. That's not in the Pennsylvania Attorney General's office. So that's a huge benefit that comes with the class settlement. Doesn't the higher depend on the market? The higher? Well, it does. I mean, the way that the settlement works is that class members, whether or not they made this affirmative election, are gonna receive the higher of the average of the two in-basin index prices or the net back price, which would be the downstream price. The in-basin price would be without deductions. So the benefit of the settlement is that we've pushed the point of marketability for purposes of these leases to the pipeline. So for the first time, Chesapeake would be paying on basing its royalties on pipeline quality gas, which is something that would have been much bulging. Isn't that dependent to some extent on the market index? That's what I'm saying. Both of them are to some extent. But if the prices are lower as to the, even without deductions for those index prices, but you can do better downstream with deductions, that class members are gonna get the higher price. But your settlement modifies all of the leases, even if people had opted out originally, modifies all 23,000 leases going forward so that there will never be another opportunity if the people think that they're not being calculated right. Is that correct? A couple of things, Your Honor. First, the MEC class is smaller than the non-MEC class. The universe of lessors in Pennsylvania who have these lease terms is much smaller. It's about 8,900 lessors, less than the people who opted out in this settlement, which is about 275 opt-outs. Your Honor wants me to address this issue that was raised in the objector's brief about prior opt-outs. I'm happy to do that. That troubles me. Well, Your Honor, the idea that there was a due process problem with the composition of the class and that it included people who had submitted opt-outs in the previous settlement so that there should have been some carve-out in this settlement, I don't think as a practical matter that's something that makes sense and that the practical effect would have been leaving those class members worse off because they were... No, what it would have left them with is a post-confirmation royalty interest unaffected, right? So that, yes, they wouldn't have gotten their $150 or whatever it was out of the monetary part of this settlement, but going forward, if they thought that whatever the prior royalty was wasn't, might look better than whatever you had negotiated or something, I can't say why they'd opt-out. They could still sue Chesapeake and you have, A, modified their lease and deprived them of any ability to challenge the royalty going forward. Well, they would be... Your Honor's correct that they wouldn't have the benefit of this go-forward, but that, and certainly they wouldn't be entitled to any part of the settlement fund that had been created here, but their opt-outs, the opt-out notice that they sent six years ago was to a settlement that was never, as you said, it was never consummated, that the settlement was never finally approved, the agreement was rejected in bankruptcy, so those opt-out letters... How much time did these people have to opt-out this time around? I believe they had 60 days, and the notice period, which is a typical amount of time, the notice period, the notice process, I think, worked well in having about, again, I think it was 273 opt-outs, I think indicates that people were aware of the new settlement, and those who had previously opted out of a settlement that, in a different court, with different terms, I think it's reasonable to, rather than assume that they're not able to benefit from the settlement, the way that we've approached it here was to at least give them the choice, if they wanted to opt-out, they could, but I think it would actually introduce a different due process problem if we had assumed that these opt-out letters from five years ago would preclude them from the benefits of this settlement, which, again, I think are, there's record, bless you, that the record shows that this, particularly this go-forward, is extremely valuable, and we're proud of the result that we achieved. Okay. Thank you. Mr. Donovan. May it please the Court, good morning, Your Honors. Very quickly, let me address the first question about the index option. For the non-MEC claims, was always part of our settlement, going back to the settlement that we moved for preliminary approval on before Judge Magnin. We had come up with that index option, in other words, giving the landowners the choice of how you want your royalty calculated, and the reason why we came up with that option, and this is before the Attorney General was even on the scene, because they were still litigating with Chesapeake at the time. The reason why we developed that index option was the claims in our case had nothing to do with the lease terms. The claims in our case was that the midstream gas gathering company that had been created by Chesapeake, Access Midstream, was overcharging for the transportation charges to our royalty owners, and then kicking back that money to Chesapeake, because they had been financed by Chesapeake and promised them a 15.5% return on the bonds Chesapeake floated to create Access Midstream, and hence we had RICO claims that said, you're inflating your charges to us to meet your guaranteed rate of return to an affiliated party that we have our lease with. Classic RICO violation. They were sustained. We were litigating ahead. How do you address that type of inflated gas gathering costs that reduces our royalties? One way to do it is, okay, let's have a market check on what the real chargeback should be, because if we go to the market and we see that the index is paying a better royalty, net royalty amount, to our clients than not, well then we know that there are inflated charges passing through to our royalties. Does that make sense, your honors? So we said, okay, let our clients make a decision. If you feel more comfortable with the market index, and this way you know Chesapeake's not robbing you, fine, choose the index, but we don't wanna make that choice for you. We're lawyers, we have to obey your free will. You don't wanna do that? Go, continue with the net back. The net back, actually, we don't know, but now all my clients are happy because natural gas prices are high, and the index is a very good option, and they were all very, very pleased with what that option provides them. How many clients, you're talking about the named? Well, the named, yes, that's where most of my feedback is from, however, you wouldn't imagine the thousands and thousands of calls that I've gotten over the years related to this litigation, because I actually have to spend time up in State College in Braddock County, Pennsylvania, and I have to answer them, and that's where I live, so that's going to be what I answer to. So the reality of it is, is the AG came to us and said, all right, we're going to settle this case in bankruptcy, because basically the AG was out of court. There was a Pennsylvania Supreme Court decision, the Anadarko decision, that decimated the AG's case. The AG had no case. Well, they reached the settlement in this case. They did, they reached the settlement that I had previously negotiated many years before on behalf of my clients. Their settlement is my settlement. That's basically it. That allows them to choose. Exactly. They called me. They said. Okay, so what does your settlement do vis-a-vis the AG's settlement? My settlement just adds on and implements the choice. It is through my settlement that the AG's choice is being implemented. Well, which is to say you're picking, I mean, they don't have the choice anymore, right? Well, they've made the choices. Now, it hasn't been implemented yet. Unlike the Met case, which is the higher of our case, you actually have to make the affirmative choice. So there are some people who went with the index, and there are some people who did not go with the index, and they stuck to the net back. And they've all agreed that they have no claim going forward against Chesapeake ever. Well, right, and there are, yes, and there's a number of reasons for that. But that wasn't on the table before the bankruptcy ended. Well, see, here's the practicality to it, Your Honor. If the leases flowed through, and if this same continuing. They did flow through. They did. Right, if the leases flowed through, and we still had the same problem with the access midstream, the midstream transporter and everything, then the litigation flowed through. We would just be back in front of Judge Mannion, and I guess, yes, Chesapeake could have said, okay, let's go back in front of Mannion, let's reunite the litigation, because our case would still be there, and let's just approve the exact same thing. Yes, we could have had a different Article III judge in the Middle District of Pennsylvania approve the very thing that I had filed in front of him only at a lesser number. Yeah, but, you know, everybody knows bankruptcy courts are more favorable for them. Well, I can't disagree with you, Your Honor, because I'm a plaintiff's lawyer, and that's Chesapeake's view. That was Chesapeake's view. I didn't have a choice. So you did have a choice, actually. Well, I. The bankruptcy is confirmed. You do have a choice. Yes, we could have continued ahead with Judge Mannion. We would have the exact same case that basically, the same settlement that was being implemented with the AG, we would then. Presumably, Judge Mannion knew an awful lot more about the background of the behavior of Chesapeake than Judge Jones did. Well, you know, I don't know. Because by the time the bankruptcy happened, the AG's case was basically decimated by the Pennsylvania Supreme Court. So I think what was driving this, because it was a global settlement, what was driving this was the AG wanted out. They called up, said, what do you guys need for your clients, because after all, we had the relationship with the. What time frame are you talking about? I think, I would say it's February, March connection to the, while the bankruptcy was happening. And March, basically, as I recall, the PA Supreme Court's Anadarko decision comes out in February or thereabouts. The AG then calls up because they knew they were gonna be out of court. Chesapeake was before the Pennsylvania Supreme Court on the same issue. Their cases stayed due to the bankruptcy. Anadarko's, the Anadarko decision has the exact same issue. Everything's decided in favor of Anadarko against the PA AG. So the PA AG saw the writing on the wall and said, ah, well, the same thing applies to Chesapeake, even though everything stayed. So the AG wants out, they call up, they say, Mike, what do you need? I presume they called Dan and Mr. Moffitt, said, guys, what do you need? We explained it to them. There was general negotiations going on in the bankruptcy. The bankruptcy judge knew this. In fact, I sat on the royalty owners committee for a little while until they said, hey, look, the class lawyers probably have a conflict. They should get off the royalty owners committee. We got off. So it was abundantly clear to the bankruptcy judge and to everyone that the PA AG, us, and the Meck case were negotiating a resolution. I don't understand the timing of this. Was the Anadarko, did the Anadarko decision come down in 2021? Is that what you're saying, February of 21? I want to say that's right, yes, Your Honor. I may be misremembering. Well, they filed bankruptcy in June, around May or June of 2020. So if you were on the royalty owners committee, it was well before Anadarko. Yes, that's correct. That's absolutely, and at the time that happened, the AG didn't know, the AG really wasn't trying to settle anything. So we were on the royalty owners committee. But the AG, Pennsylvania AG, ends up with a settlement, but it's not that bad, right? No, it's basically, it's my settlement. Well, if he had lost his case in the Pennsylvania Supreme Court, if it was, quote, decimated, then what's so good, how was he, did he have leverage to get your settlement? I think basically, it's the going forward relief that he added to his claims. I mean, he had consumer protection law claims. He had no leverage, according to you, because Anadarko had decimated his case. I agree, he didn't. So Chesapeake was just giving him away something. Well, Chesapeake wanted to get rid of all the litigation and wanted to treat it as a global resolution. And they, I think, money is, they had a pot and this is how it got carved up. That was basically it. Money is not the point of this settlement. The money is some change. Exactly, I agree 100% with Your Honor. It's the going forward index relief. And the going, and that's why there is Article III jurisdiction here. That it's because we had these claims that our clients thought Chesapeake was fooling around with the gas transportation charges. Those are continuing claims in a continuing royalty relationship. Those deductions are the particularized, imminent and concrete damages to my clients. Now, are there non-producing wells? Every so often, everybody has, at one time or another, a shut-in well for any countless number of reasons. Now, it could be shut-in because it's not producing or it could be shut-in because there's a problem with the downstream transportation or it could be shut-in because of market conditions. Now, most of your shut-in wells are pure non-producing wells because there's a demand for gas. But I can tell you this, when we filed suit in 15 and 16, some wells were shut-in because the market wouldn't support producing those wells because gas was $2.30 at MBTU. So, I don't think whether a particular well is non-producing or not is the right answer because there is a continuing contractual royalty relationship that is particularized and imminent. That could be producing well tomorrow. So, I don't think that's the way to go on as a matter of law. So, unless, Your Honor, I'm way over, I'm sorry. That's okay, background is interesting. All right, thank you. Thank you. I believe the bankruptcy judge should be affirmed. I mean, Judge Rosenthal should be affirmed. Thank you, Your Honor. All right. I wanna start with Mr. Sells' comment about the opt-outs and the prior opt-outs in the Demcheck settlement. Some 20% of that class exercised the right to exclude themselves by 2016. And both Mr. Sells and the district court proceeded from the wrong assumption. When an opt-out is filed, you don't opt-out of a settlement, you opt-out of a class. And the court below seemed to think that it was somehow conditional. So, if you opt-out and then, for whatever reason, don't choose to pursue a claim, that that somehow means you then get put back in the class. And she took a line from Schutz v. Phillip Petroleum that was kind of out of context and used that as the basis for her decision. But what Schutz really says is that when you return an opt-out form, you are, quote, removed from the litigation entirely. And that's Schutz at 472 U.S. 797-810. And then the decision to opt-out of a class is the decision that I don't want to be represented by these lawyers or these named plaintiffs, so it's a little unseemly for them to be making decisions about whether the people should be brought back into the class, particularly when those same people had the choice that they preserved by opting out to elect the going forward relief under the AG settlement. I want to talk a little bit about Mr. Donovan's suggestion that there's going forward standing here and some continuing violation. And again, Justice Kavanaugh's statement in TransUnion is relevant, that it only becomes a particularized concrete injury when it occurs. It's not the mere threat of harm. And the claims in Mr. Donovan's suit were about inflated post-production charges due to an affiliate arrangement that Chesapeake had among its affiliates. And here's what Mr. Donovan told the bankruptcy court at the hearing on the 1919 motion, and it's at page 1611 of the record. Our contention was that those costs were inflated due to the affiliate agreement. There is no more affiliate. That entity was sold off to Williams. So those claims can't possibly exist after the effective date. And in fact, if you look at paragraph 37 and 44 and 46 of the Chesapeake motion to have Rule 9019 applied, that Chesapeake confirms that all the claims in the pending class cases, both Demchak and the Brown-Susenbeck case, had been discharged. And the concern was about post-effective date, potential future royalty litigation. I'm citing that. I'm sorry? Where are you getting that citation for that last statement that they had supposedly said this is all post-effective date? That's paragraph 37 and 44 of the Chesapeake motion to have Rule 9019 applied. And I'm testing my memory, but I believe it's pages 1303 and 1304 of the record. Okay, well, now your red light is on, so thank you. All right, we have one more case this morning. It's number.